

Nathan R. Hoeschen
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0709
nhoeschen@shawkeller.com

January 20, 2020

**BY CM/ECF & HAND DELIVERY**
The Honorable Leonard P. Stark
United States District Court for the District of Delaware
844 N. King Street
Wilmington, DE 19801

**REDACTED-
PUBLIC VERSION**

      Re:   *Biogen International GmBH, et al. v. Banner Life Sciences LLC*,
             C.A. No. 18-2054-LPS

Dear Judge Stark:

This firm, along with Parker Poe Adams & Bernstein, LLP, represents Defendant Banner Life Sciences LLC in the above-referenced litigation. We write regarding the Court's entry of final judgment in this matter pursuant to your Order during the teleconference on Friday, January 17.

As the Court ordered, Banner negotiated with Biogen on the form of a proposed Order for entry of Final Judgment and a limited Temporary Restraining Order ("TRO") to allow Biogen time to seek an injunction pending appeal from the Federal Circuit. Although the parties have reached general agreement on the proposed Order relating to the Final Judgment (*see* paragraphs 1-3 of Exhibit A), the parties were unable to agree on three aspects of the TRO: (1) whether, given that the patent only claims a method of use, Banner should be enjoined from commercial activities that would not infringe the claims; (2) the reciprocity of the maintenance of the status quo during the term of the TRO; and (3) the security required. (*See* the comparison of the parties' competing orders, attached as Exhibit B.)[1]

**1. The Scope of Injunction Should Permit Non-Infringing Activities**

U.S. Patent No. 7,619,001 claims only a method of use, and therefore direct infringement requires administration of product to a patient. Here, Banner does not administer its product to anyone, so at most it could only be liable for infringement under 35 U.S.C. § 271(b) and (c). Furthermore, liability for inducement or contributory infringement only lies if there is direct infringement. *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 572 U.S. 915, 921 (2014). Hence, before patients have access to Banner's product, there can be no infringing activity.

Given that the patent claims a method of use, both forms of Order agree that the Temporary Restraining Order shall not prohibit Banner from (1) pursuing and potentially receiving FDA final approval and/or (2) conducting pre-launch activities prior to offering the product for sale and selling the product. As discussed with Biogen's counsel, Biogen's form of Order would permit distribution and warehousing of Banner's product, so long as Banner maintains title to the product. However, Biogen's proposed draft Order is still overly restrictive,

---

[1] Banner's Proposed Final Judgment and Limited Temporary Restraining Order is attached as Exhibit A.

as it oversteps the scope of its claims. By prohibiting offers for sale, Biogen seeks to prevent Banner from contracting with purchasers of its product even if that contract includes contractual language consistent with the TRO prohibiting distribution to patients during the life of the TRO. Since those offers for sale will not lead to infringement during the TRO, they should be permitted subject to sufficient protection for Biogen. Banner's order requiring such contractual provisions is sufficient to permit offers for sale and avoid infringement.

With regard to the issue of sales, Banner's proposal allows Banner to (1) enter into contracts for sale of its product (discussed above) and (2) transfer title to wholesalers and authorized distributors, so long as Banner contractually prohibits physical distribution of the product from those businesses to patients. (*See* Exhibit A at paragraphs 6-8.) Banner's proposal prohibits any direct infringement (if Banner's product ultimately were found to infringe) while still allowing Banner to minimize its potential losses by taking steps to ready its product for launch. Banner's proposal thus serves to better limit the potential damage to each of Banner and Biogen, and the Court should enter Banner's proposed Order on this point. In this way, Banner's proposal answers the Court's question as to whether there is a place in the distribution process between Banner and the patient where sufficient protection is granted Biogen. (*See* Transcript of Jan. 17, 2020 Teleconference at 16:11-17:2.)

Thus, Banner's language with regard to paragraphs 5 through 8 of its Proposed Order should be entered.

## 2. Maintenance of the Status Quo Should Not Act to Banner's Potential Detriment

The parties disagree about whether to include in the Order Banner's paragraph 10(ii) in Exhibit A. This subparagraph relates to one of the conditions Biogen needs to approve to receive the TRO and prohibits Biogen from taking steps during the pendency of the temporary restraining order to change the market to Banner's detriment.

Banner understood that the reason Biogen requested the TRO was to maintain the status quo during an approach to the Federal Circuit by Biogen. (*See id.* at 10:20-12:15.) Banner believes its proposed provision is necessary to prevent Biogen from taking market changing activity during the pendency of the TRO. However, Biogen appears to want to use the temporary restraining order as both a sword and a shield, maintaining the status quo with regard to keeping Banner off the market, but permitting itself to make changes in the market that would harm Banner's delayed market place entry.

Biogen was aware that FDA had tentatively approved Banner's NDA, and Biogen was aware that the Court could find in Banner's favor. (*See id.* at 28:19-29:8.) In that time Biogen has made choices about marketing of its Tecfidera® and Vumerity™ products to its own advantage. Biogen has had months to prepare for a potential competitor entering the market, and if Biogen chose not to take steps that would harm the market in the meantime, Biogen has enjoyed the fruits of that market. If Biogen is not required to maintain the status quo with regard to its Tecfidera® and Vumerity™ products during the pendency of the TRO, however, it will essentially be given two weeks to interfere with the potential market for Banner's product, during which time this Court will have prevented Banner from competing at Biogen's request. Biogen should not be permitted to change the market while keeping Banner out of it.

2

If the status quo is to be maintained, it should be maintained on both sides.  On the other hand, if Biogen does not believe this condition is worth agreeing to for purposes of obtaining the TRO, then Biogen can opt not to agree and permit Banner to enter the market upon approval.

### 3.  The Security Should Be Sufficient To Cover Banner's Potential Losses

The parties have been unable to agree on the amount of security Biogen must provide to cover Banner's potential losses during the time Banner is prohibited from entering the market.  Banner's proposal provides flexibility for both parties with regard to the ultimate amount of Banner's losses due to the TRO and any potential injunction pending appeal ordered by the Federal Circuit.  (*See* Ex. A at paragraphs 10(iv)-15.)  Biogen previously asserted that it has the financial resources to cover Banner's potential damages (*see* D.I. 55 at p. 3), and Banner is willing to accept Biogen's undertaking rather than making Biogen post a security bond.[2]  Relying on Biogen's undertaking as Banner proposes is more efficient than requiring the parties to renegotiate a second security from Biogen if the Federal Circuit grants an injunction pending appeal.

In contrast, Biogen's offer of $100,000 as security is too low.  To put Biogen's proposal in context, through September 30, 2019, Biogen's total worldwide revenues for Tecfidera® in 2019 (approximately 39 weeks) were $3.2714 billion (Biogen Inc. Quarterly Report (10-Q) at 20 (excerpt attached as Exhibit C)), which works out to about $84 million/week.  And, Biogen's counsel has stated that Biogen has invested ▮▮▮▮▮▮▮▮▮ in its new MS product, Vumerity™.  (*See* Transcript of Jan. 17, 2020 Teleconference at 14:19-15:1.)  By contrast, $100,000 is about the list price for one year of Tecfidera® therapy for a single patient.  (*See* Ed. Silverman, *High cost of multiple sclerosis medicines is forcing many patients to take 'drastic actions'* STAT at page 2 (January 13, 2020) (attached as Exhibit D).)

Again, Biogen has a choice.  It can (1) receive the TRO and provide adequate security, or (2) it can refuse to provide the undertaking and be denied the TRO.  It should not be able to obtain the TRO without sufficient security.

* * *

Banner respectfully requests that the Court enter an Order substantially in the form of Exhibit A.

Respectfully submitted,

*/s/ Nathan R. Hoeschen*

Nathan R. Hoeschen (No. 6232)

cc: Clerk of Court (via hand delivery)
    Counsel of Record (via electronic mail)

---

[2] Indeed, until approximately 40 minutes prior to when the parties' letters were scheduled to be filed, Banner thought it had reached agreement on this point.  At that time, Biogen's counsel, however, indicated there had been a miscommunication necessitating the extension request and the letter briefing of this issue.

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BIOGEN INTERNATIONAL GMBH,<br><br>            Plaintiff,<br><br>   v.<br><br>BANNER LIFE SCIENCES LLC,<br><br>            Defendant. | C.A. No. 18-2054-LPS |

**[PROPOSED] FINAL JUDGMENT AND LIMITED**
**TEMPORARY RESTRAINING ORDER**

Pursuant to the Court's Memorandum Opinion and Order (D.I. 52, 53) of January 7,

2020, granting Banner's Motion for Judgment on the Pleadings, and the Court having considered

the parties' positions in the Joint Status Report dated January 13, 2020 (D.I. 55) and in a joint

teleconference on January 17, 2020, and for the reasons stated on the record during that

teleconference, it is hereby ORDERED and ADJUDGED that:

1.      Final Judgment of non-infringement is entered on behalf of Defendant Banner

Life Sciences ("Banner") with regard to its counterclaim and against Plaintiff Biogen

International GmbH's ("Biogen") claim of infringement regarding all claims of U.S. Patent No.

7,619,001 for the reasons stated in the Court's Memorandum Opinion of January 7, 2020.

2.      Defendant is the prevailing party as to Plaintiff's claims of infringement of U.S.

Patent No. 7,619,001 and as to Defendant's counterclaims for declaratory judgment of

noninfringement of U.S. Patent No. 7,619,001.

3.      Any motion for an award of costs or attorneys' fees shall be deferred until all

appeals relating to this litigation have been exhausted and the Mandate has issued from the Court

of Appeals.  If Plaintiff does not file an appeal in this litigation, Defendant's deadline for filing such motions and their bills of costs shall be extended to 45 days after the deadline for Plaintiff to file an appeal has lapsed.

4.      After this Court rendered its January 7, 2020, Memorandum Opinion finding that Banner did not infringe, Biogen orally requested on January 17 either a Temporary Restraining Order or an Injunction pending appeal.  Having considered the premises and the arguments of the parties, and for the reasons stated on the record at the teleconference of January 17, 2020, this Court denies Biogen's motion for an injunction pending appeal but grants a limited Temporary Restraining Order.

5.      The Court also notes that the claims of the patent at issue are limited to only method of treatment claims that only can be infringed—if at all—upon actual administration to a patient, and thus, the scope of this injunction is limited in conformity with the scope of the patent.

6.      To allow Biogen time to pursue an injunction pending appeal from the Court of Appeals for the Federal Circuit, Banner is enjoined from selling the product pursuant to NDA No. 210296 directly to patients prior to the expiration of this Temporary Restraining Order. Banner will be permitted during the pendency of the Temporary Restraining Order to the extent consistent with FDA statutes, rules, and regulations to contract with its customers to provide product as long as those contracts prevent the distribution of product to patients prior to the expiration of this Temporary Restraining Order.

7.      For the avoidance of doubt, this Temporary Restraining Order will not prohibit the FDA from finally approving Banner's NDA No. 210296 should the FDA determine that the NDA has otherwise satisfied the conditions of final approval.

8.     Nor does this Temporary Restraining Order prohibit Banner from engaging in any pre-launch activities of the product covered by NDA No. 210296 including manufacturing, offers for sale, etc.  And, this Temporary Restraining Order also does not prohibit Banner from selling or otherwise providing product to its customers, including pharmaceutical wholesalers, authorized distributors and third party logistic companies.  Nor does it prohibit stocking product in warehouses subject to the restriction that the injunction will prohibit Banner from permitting physical distribution of the product covered by Banner's NDA No. 210296 directly to patients.

9.     This Temporary Restraining Order will expire on the earlier of (a) February 4, 2020 at 12:01 a.m. Eastern Standard Time or (b) a decision from the Federal Circuit denying any motion for an injunction during the pendency of any appeal.

10.     Additionally, this limited Temporary Restraining Order is expressly conditioned on Biogen's compliance with the following terms, all of which the Court deems reasonable and appropriate to preserve the status quo for (at most) until February 4, 2020 at 12:01 a.m. Eastern Standard Time:

(i)     Biogen will move to expedite its appeal in the Federal Circuit.  Biogen agrees that it will file its motion for relief before the Federal Circuit with all deliberate speed and that Banner can expedite its opposition as it deems appropriate;

(ii)     Biogen shall not take proactive commercial actions during the pendency of this Temporary Restraining Order to compete with Banner's NDA product or alter the commercial status quo in the marketplace with either its Vumerity$^{TM}$ or Tecfidera$^®$ products (e.g., Biogen shall not launch an authorized generic of either product, lower the price in any way of either product, flood the market with product, or otherwise depart from its presently enacted marketing);

      (iii)     Biogen shall not take any steps or actions to delay or inhibit final approval of Banner's NDA product;

      (iv)     As described further in this Order, Biogen will agree to secure Banner from losses sustained during the pendency of this Temporary Restraining Order, to the extent that such losses are proven in a later proceeding.

11.    With regard to the form of security pursuant to Federal Rules of Civil Procedure 62(d) and 65(c), Biogen has represented that it has the financial health and means to secure Banner against any losses incurred during the time Banner is held off the market both during the pendency of this Temporary Restraining Order—and, should the Federal Circuit enact a longer injunction, through patent expiration—by means of an undertaking to pay damages rather than by the posting of a bond in a specific amount.  *See* D.I. 55 at page 3.  Banner has agreed that Biogen's undertaking as expressed below is sufficient security during the pendency of the Temporary Restraining Order.

12.    Biogen represents that it will be fully capable of paying the costs and damages sustained by Banner resulting from the imposition of the Temporary Restraining Order (and any Federal Circuit injunction) in the event that Banner is found to have been wrongfully enjoined and to the extent that such costs and damages are proven in a later proceeding either by motion or through an action based on Federal Rule of Civil Procedure 65(c) and 65.1.

13.    Biogen further represents that it will pay costs and damages proven to be sustained by Banner, resulting from the imposition of the Temporary Restraining Order (and any Federal Circuit injunction) in the event that Banner is found to have been wrongfully enjoined. Biogen will not refuse to pay such costs and damages on the ground that the requirements of the Federal Rules of Civil Procedure relating to security for injunctions is not met.

14.     Biogen further represents that it will not file any motion, application, or request to the Court to modify or reduce the payment of the amount of costs and damages should one be awarded to Banner on the ground that it did not give security in a set amount.  Biogen also will not assert that its corporate structure hinders or impacts its ability to pay any costs and damages awarded to Banner.

15.     Biogen further understands that one of the purposes and effects of giving a set amount of security is to limit the payment of costs and damages due to a wrongful injunction to that set amount.  By requesting and agreeing to the Temporary Restraining Order, Biogen understands that it is assuming the risk that, if the restraining order (and any Federal Circuit injunction) is found to have been wrongfully imposed, the costs and damages sustained by Banner may be more than what Biogen expected, and/or more than what a set amount of security could have been.  Biogen assumes this risk.

January _____, 2020

_____
HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BIOGEN INTERNATIONAL GMBH,<br><br>Plaintiff,<br><br>v.<br><br>BANNER LIFE SCIENCES LLC,<br><br>Defendant. | C.A. No. 18-2054-LPS |

## [PROPOSED] FINAL JUDGMENT AND LIMITED
## TEMPORARY RESTRAINING ORDER

Pursuant to the Court's Memorandum Opinion and Order (D.I. 52, 53) of January 7, 2020, granting Banner's Motion for Judgment on the Pleadings, and the Court having considered the parties' positions in the Joint Status Report dated January 13, 2020 (D.I. 55) and in a joint teleconference on January 17, 2020, and for the reasons stated on the record during that teleconference, it is hereby ORDERED and ADJUDGED that:

1.  Final Judgment of non-infringement is entered on behalf of Defendant Banner Life Sciences ("Banner") with regard to its counterclaim and against Plaintiff Biogen International GmbH's ("Biogen") claim of infringement regarding all claims of U.S. Patent No. 7,619,001 for the reasons stated in the Court's Memorandum Opinion of January 7, 2020.

2.  Defendant is the prevailing party as to Plaintiff's claims of infringement of U.S. Patent No. 7,619,001 and as to Defendant's counterclaims for declaratory judgment of noninfringement of U.S. Patent No. 7,619,001.

3.  Any motion for an award of costs or attorneys' fees shall be deferred until all appeals relating to this litigation have been exhausted and the Mandate has issued from the Court

of Appeals.  If Plaintiff does not file an appeal in this litigation, Defendant's deadline for filing

such motions and their bills of costs shall be extended to 45 days after the deadline for Plaintiff

to file an appeal has lapsed.

4.      After this Court rendered its January 7, 2020, Memorandum Opinion finding that

Banner did not infringe, Biogen orally requested on January 17 either a Temporary Restraining

Order or an Injunction pending appeal.  Having considered the premises and the arguments of the

parties, and for the reasons stated on the record at the teleconference of January 17, 2020, this

Court denies Biogen's motion for an injunction pending appeal but grants a limited Temporary

Restraining Order.

~~5.      The Court also notes that the claims of the patent at issue are limited to only~~

~~method of treatment claims that only can be infringed—if at all—upon actual administration to a~~

~~patient, and thus, the scope of this injunction is limited in conformity with the scope of the~~

~~patent.~~

~~6~~5.      To allow Biogen time to pursue an injunction pending appeal from the Court of

Appeals for the Federal Circuit, Banner is enjoined from ~~selling~~ launching the product ~~pursuant~~

~~to~~ that is the subject of its NDA No. 210296 ~~directly to patients~~ prior to the expiration of this

Temporary Restraining Order.  ~~Banner will be permitted during the pendency of the Temporary~~

~~Restraining Order to the extent consistent with FDA statutes, rules, and regulations to contract~~

~~with its customers to provide product as long as those contracts prevent the distribution of~~

~~product to patients prior to the expiration of this Temporary Restraining Order.~~

~~7~~6.      For the avoidance of doubt, this Temporary Restraining Order will not prohibit

the FDA from finally approving Banner's NDA No. 210296 should the FDA determine that the

NDA has otherwise satisfied the conditions of final approval.

~~8~~7.     Nor does this Temporary Restraining Order prohibit Banner from engaging in ~~any~~ pre-launch activities ~~of the product covered by NDA No. 210296 including~~ such as manufacturing~~, offers for sale, etc~~ or stocking product in warehouses. ~~And, this~~This Temporary Restraining Order ~~also~~ does ~~not~~ prohibit Banner from selling or ~~otherwise providing product to its customers, including pharmaceutical wholesalers, authorized distributors and third party logistic companies.  Nor does it prohibit stocking product in warehouses subject to the restriction that the injunction will prohibit Banner from permitting physical distribution of the product covered by Banner's NDA No. 210296 directly to patients.~~offering for sale the product that is the subject of its NDA No. 210296.

~~9~~8.     This Temporary Restraining Order will expire on the earlier of (a) February 4, 2020 at 12:01 a.m. Eastern Standard Time or (b) a decision from the Federal Circuit denying any motion for an injunction during the pendency of any appeal.

~~10~~9.     Additionally, this limited Temporary Restraining Order is expressly conditioned on Biogen's compliance with the following terms, all of which the Court deems reasonable and appropriate to preserve the status quo for (at most) until February 4, 2020 at 12:01 a.m. Eastern Standard Time:

(i)     Biogen will move to expedite its appeal in the Federal Circuit.  Biogen agrees that it will file its motion for relief before the Federal Circuit with all deliberate speed and that Banner can expedite its opposition as it deems appropriate;

~~(ii)     Biogen shall not take proactive commercial actions during the pendency of this Temporary Restraining Order to compete with Banner's NDA product or alter the commercial status quo in the marketplace with either its Vumerity™ or Tecfidera® products (e.g., Biogen shall not launch an authorized generic of either product, lower the~~

~~price in any way of either product, flood the market with product, or otherwise depart from its presently enacted marketing);~~

~~(iii)~~(ii) Biogen shall not take any steps or actions to delay or inhibit final approval of Banner's NDA product;

~~(iv)As described further in this Order, Biogen will agree to secure Banner from losses sustained~~ (iii) Biogen agrees to provide security in the form of a corporate undertaking during the pendency of this Temporary Restraining Order in the amount of $100,000, pursuant to Fed. R. Civ. P. 65(c) to cover proven damages, if any, to the extent that ~~such losses are proven~~ Banner proves damages in a later proceeding.

~~11.    With regard to the form of security pursuant to Federal Rules of Civil Procedure 62(d) and 65(c), Biogen has represented that it has the financial health and means to secure Banner against any losses incurred during the time Banner is held off the market both during the pendency of this Temporary Restraining Order—and, should the Federal Circuit enact a longer injunction, through patent expiration—by means of an undertaking to pay damages rather than by the posting of a bond in a specific amount.  *See* D.I. 55 at page 3.  Banner has agreed that Biogen's undertaking as expressed below is sufficient security during the pendency of the Temporary Restraining Order.~~

~~12.    Biogen represents that it will be fully capable of paying the costs and damages sustained by Banner resulting from the imposition of the Temporary Restraining Order (and any Federal Circuit injunction) in the event that Banner is found to have been wrongfully enjoined and to the extent that such costs and damages are proven in a later proceeding either by motion or through an action based on Federal Rule of Civil Procedure 65(c) and 65.1.~~

13.    Biogen further represents that it will pay costs and damages proven to be sustained by Banner, resulting from the imposition of the Temporary Restraining Order (and any Federal Circuit injunction) in the event that Banner is found to have been wrongfully enjoined. Biogen will not refuse to pay such costs and damages on the ground that the requirements of the Federal Rules of Civil Procedure relating to security for injunctions is not met.

14.    Biogen further represents that it will not file any motion, application, or request to the Court to modify or reduce the payment of the amount of costs and damages should one be awarded to Banner on the ground that it did not give security in a set amount.  Biogen also will not assert that its corporate structure hinders or impacts its ability to pay any costs and damages awarded to Banner.

15.    Biogen further understands that one of the purposes and effects of giving a set amount of security is to limit the payment of costs and damages due to a wrongful injunction to that set amount.  By requesting and agreeing to the Temporary Restraining Order, Biogen understands that it is assuming the risk that, if the restraining order (and any Federal Circuit injunction) is found to have been wrongfully imposed, the costs and damages sustained by Banner may be more than what Biogen expected, and/or more than what a set amount of security could have been.  Biogen assumes this risk.


January _____, 2020                    _____
                                       HONORABLE LEONARD P. STARK
                                       UNITED STATES DISTRICT JUDGE

Exhibit C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

### QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2019

OR

### TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 0-19311



# BIOGEN INC.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **33-0112644** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**225 Binney Street, Cambridge, MA** 02142
**(617) 679-2000**
*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.0005 par value** | **BIIB** | **The Nasdaq Global Select Market** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files):   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | |
|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer |
| Non-accelerated filer | | Smaller reporting company |
| | | Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The number of shares of the issuer's Common Stock, $0.0005 par value, outstanding as of October 21, 2019, was 180,441,878 shares.

Table of Contents

BIOGEN INC.
FORM 10-Q — Quarterly Report
For the Quarterly Period Ended September 30, 2019

## TABLE OF CONTENTS

**PART I — FINANCIAL INFORMATION**                                                    Page

Item 1.        Financial Statements (unaudited)

               Condensed Consolidated Statements of Income — For the Three and Nine Months Ended September 30, 2019 and 2018        5

               Condensed Consolidated Statements of Comprehensive Income — For the Three and Nine Months Ended September 30,        6
               2019 and 2018

               Condensed Consolidated Balance Sheets — As of September 30, 2019 and December 31, 2018        7

               Condensed Consolidated Statements of Cash Flows — For the Nine Months Ended September 30, 2019 and 2018        8

               Condensed Consolidated Statements of Equity — For the Three and Nine Months Ended September 30, 2019 and 2018        9

               Notes to Condensed Consolidated Financial Statements        13

Item 2.        Management's Discussion and Analysis of Financial Condition and Results of Operations        49

Item 3.        Quantitative and Qualitative Disclosures About Market Risk        75

Item 4.        Controls and Procedures        77


**PART II — OTHER INFORMATION**

Item 1.        Legal Proceedings        78

Item 1A.       Risk Factors        78

Item 2.        Unregistered Sales of Equity Securities and Use of Proceeds        93

Item 6.        Exhibits        93

Signatures        95

Table of Contents

BIOGEN INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited, continued)

## 4.   Revenues

*Product Revenues*

Revenues by product are summarized as follows:

| (In millions) | For the Three Months Ended September 30, | | | | | |
| | 2019 | | | 2018 | | |
| | United States | Rest of World | Total | United States | Rest of World | Total |
|---|---|---|---|---|---|---|
| Multiple Sclerosis (MS): | | | | | | |
| TECFIDERA | $   842.0 | $   280.4 | $   1,122.4 | $   842.1 | $   247.9 | $   1,090.0 |
| Interferon* | 360.3 | 169.7 | 530.0 | 421.5 | 168.6 | 590.1 |
| TYSABRI | 263.0 | 220.6 | 483.6 | 253.0 | 217.2 | 470.2 |
| FAMPYRA | — | 24.2 | 24.2 | — | 22.5 | 22.5 |
| Subtotal: MS product revenues | 1,465.3 | 694.9 | 2,160.2 | 1,516.6 | 656.2 | 2,172.8 |
| Spinal Muscular Atrophy: | | | | | | |
| SPINRAZA | 236.7 | 310.4 | 547.1 | 223.9 | 243.8 | 467.7 |
| Biosimilars: | | | | | | |
| BENEPALI | — | 115.9 | 115.9 | — | 123.4 | 123.4 |
| IMRALDI | — | 49.3 | 49.3 | — | — | — |
| FLIXABI | — | 18.4 | 18.4 | — | 11.4 | 11.4 |
| Subtotal: Biosimilar product revenues | — | 183.6 | 183.6 | — | 134.8 | 134.8 |
| Other: | | | | | | |
| FUMADERM | — | 3.8 | 3.8 | — | 4.8 | 4.8 |
| Total product revenues | $   1,702.0 | $   1,192.7 | $   2,894.7 | $   1,740.5 | $   1,039.6 | $   2,780.1 |

*Interferon includes AVONEX and PLEGRIDY.

Table of Contents

**BIOGEN INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited, continued)

| (In millions) | For the Nine Months Ended September 30, | | | | | |
| | 2019 | | | 2018 | | |
| | United States | Rest of World | Total | United States | Rest of World | Total |
|---|---|---|---|---|---|---|
| Multiple Sclerosis (MS): | | | | | | |
| TECFIDERA | $ 2,429.5 | $ 841.9 | $ 3,271.4 | $ 2,396.8 | $ 766.9 | $ 3,163.7 |
| Interferon* | 1,067.3 | 518.0 | 1,585.3 | 1,237.5 | 528.4 | 1,765.9 |
| TYSABRI | 772.3 | 647.0 | 1,419.3 | 768.2 | 631.3 | 1,399.5 |
| FAMPYRA | – | 71.2 | 71.2 | — | 69.9 | 69.9 |
| ZINBRYTA | – | – | – | — | 1.4 | 1.4 |
| Subtotal: MS product revenues | 4,269.1 | 2,078.1 | 6,347.2 | 4,402.5 | 1,997.9 | 6,400.4 |
| Spinal Muscular Atrophy: | | | | | | |
| SPINRAZA | 690.6 | 863.2 | 1,553.8 | 617.8 | 636.5 | 1,254.3 |
| Biosimilars: | | | | | | |
| BENEPALI | – | 360.2 | 360.2 | — | 359.9 | 359.9 |
| IMRALDI | – | 132.3 | 132.3 | — | — | — |
| FLIXABI | – | 49.9 | 49.9 | — | 29.2 | 29.2 |
| Subtotal: Biosimilar product revenues | – | 542.4 | 542.4 | — | 389.1 | 389.1 |
| Other: | | | | | | |
| FUMADERM | – | 11.6 | 11.6 | — | 17.3 | 17.3 |
| Total product revenues | $ 4,959.7 | $ 3,495.3 | $ 8,455.0 | $ 5,020.3 | $ 3,040.8 | $ 8,061.1 |

*Interferon includes AVONEX and PLEGRIDY.

We recognized revenues from two wholesalers accounting for 28.7% and 18.4% of gross product revenues for the three months ended September 30, 2019, and 30.1% and 17.0% of gross product revenues for the nine months ended September 30, 2019.

We recognized revenues from two wholesalers accounting for 30.7% and 19.3% of gross product revenues for the three months ended September 30, 2018, and 32.4% and 18.0% of gross product revenues for the nine months ended September 30, 2018.

An analysis of the change in reserves for discounts and allowances is summarized as follows:

| (In millions) | Discounts | Contractual Adjustments | Returns | Total |
|---|---|---|---|---|
| Balance, as of December 31, 2018 | $ 127.8 | $ 888.8 | $ 34.7 | $ 1,051.3 |
| Current provisions relating to sales in current year | 480.3 | 2,149.7 | 16.1 | 2,646.1 |
| Adjustments relating to prior years | (0.4) | (46.7) | 4.6 | (42.5) |
| Payments/credits relating to sales in current year | (349.3) | (1,510.0) | (0.7) | (1,860.0) |
| Payments/credits relating to sales in prior years | (129.3) | (564.4) | (15.4) | (709.1) |
| Balance, as of September 30, 2019 | $ 129.1 | $ 917.4 | $ 39.3 | $ 1,085.8 |

Table of Contents

BIOGEN INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited, continued)

The total reserves above, which are included in our condensed consolidated balance sheets, are summarized as follows:

| (In millions) | As of September 30, 2019 | As of December 31, 2018 |
|---|---|---|
| Reduction of accounts receivable, net | $ 201.6 | $ 176.6 |
| Component of accrued expenses and other | 884.2 | 874.7 |
| Total revenue-related reserves | $ 1,085.8 | $ 1,051.3 |

### Revenues from Anti-CD20 Therapeutic Programs

Revenues from anti-CD20 therapeutic programs are summarized as follows:

| (In millions) | For the Three Months Ended September 30, 2019 | For the Three Months Ended September 30, 2018 | For the Nine Months Ended September 30, 2019 | For the Nine Months Ended September 30, 2018 |
|---|---|---|---|---|
| Biogen's share of pre-tax profits in the U.S. for RITUXAN, RITUXAN HYCELA and GAZYVA | $ 393.2 | $ 358.0 | $ 1,161.2 | $ 1,066.6 |
| Other revenues from anti-CD20 therapeutic programs | 202.6 | 153.7 | 528.4 | 378.7 |
| Total revenues from anti-CD20 therapeutic programs | $ 595.8 | $ 511.7 | $ 1,689.6 | $ 1,445.3 |

For additional information on our collaboration arrangements with Genentech, please read Note 19, *Collaborative and Other Relationships*, to our consolidated financial statements included in our 2018 Form 10-K.

### Other Revenues

Other revenues are summarized as follows:

| (In millions) | For the Three Months Ended September 30, 2019 | For the Three Months Ended September 30, 2018 | For the Nine Months Ended September 30, 2019 | For the Nine Months Ended September 30, 2018 |
|---|---|---|---|---|
| Revenues from collaborative and other relationships: | | | | |
| (Loss) profit earned under our 50% share of the co-promotion losses on ZINBRYTA in the U.S. with AbbVie | $ 0.3 | $ (0.7) | $ (0.2) | $ (7.9) |
| Revenues earned under our technical development agreement, manufacturing services agreements and royalty revenues on biosimilar products with Samsung Bioepis | 12.9 | 48.1 | 89.9 | 80.7 |
| Other royalty and corporate revenues: | | | | |
| Royalty | 3.3 | 7.9 | 9.9 | 35.8 |
| Other corporate | 93.1 | 91.9 | 462.4 | 311.6 |
| Total other revenues | $ 109.6 | $ 147.2 | $ 562.0 | $ 420.2 |

Other corporate revenues primarily reflect amounts earned under contract manufacturing agreements with our strategic partners, including Bioverativ Inc. (Bioverativ). During the three and nine months ended September 30, 2019, we recognized $65.6 million and $306.9 million, respectively, in revenues under the manufacturing and supply agreement with Bioverativ entered into in connection with the spin-off of our hemophilia business, compared to $36.5 million and $131.1 million, respectively, in the prior year comparative periods.

During the third quarter of 2019 we amended our agreement with a contract manufacturing customer. Under the amended agreement, we will license certain of our manufacturing-related intellectual property to the customer. We will be eligible to receive $500.0 million in a series of three payments. The first payment is due upon a regulatory achievement related to the customer's product manufactured using our manufacturing-related intellectual property, with subsequent payments payable upon the first and second anniversaries of the regulatory achievement. We do not expect to recognize any amounts related to this arrangement in 2019 as we do not expect the regulatory achievement to occur until 2020. If we earn this payment, we expect to allocate the consideration between the license for the manufacturing-related intellectual property and the manufacturing product supply services.

Table of Contents

BIOGEN INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited, continued)

For additional information on our collaboration arrangement with Samsung Bioepis, please read Note 17, *Collaborative and Other Relationships,* to these condensed consolidated financial statements. For additional information on our collaboration arrangement with AbbVie Inc., please read Note 19, *Collaborative and Other Relationships,* to our consolidated financial statements included in our 2018 Form 10-K. For additional information on our manufacturing and supply agreement with Bioverativ, please read Note 3, *Hemophilia Spin-Off,* to our consolidated financial statements included in our 2018 Form 10-K.

## 5.  Inventory

The components of inventory are summarized as follows:

| (In millions) | As of September 30, 2019 | | As of December 31, 2018 |
|---|---|---|---|
| Raw materials | $ 159.3 | $ | 196.3 |
| Work in process | 421.7 | | 606.7 |
| Finished goods | 170.8 | | 133.5 |
| Total inventory | $ 751.8 | $ | 936.5 |
| | | | |
| *Balance Sheet Classification:* | | | |
| Inventory | $ 751.8 | $ | 929.9 |
| Investments and other assets | — | | 6.6 |
| Total inventory | $ 751.8 | $ | 936.5 |

In the first quarter of 2019 we sold to Bioverativ hemophilia-related inventory on hand with a cost basis totaling $173.5 million pursuant to the terms of the manufacturing and supply agreement with Bioverativ entered into in connection with the spin-off of our hemophilia business.

Long-term inventory, which primarily consists of work in process, is included in investments and other assets in our condensed consolidated balance sheets.

### Divestiture of Hillerød, Denmark Manufacturing Operations

On August 1, 2019, we completed our sale of all of the outstanding shares of our subsidiary that owned our biologics manufacturing operations in Hillerød, Denmark to FUJIFILM. This transaction included the sale of $14.0 million of work in process inventory.

In addition, we sold to FUJIFILM approximately $41.8 million of raw materials that were remaining at the Hillerød facility on the closing date of this transaction. These materials were sold at cost, which approximates fair value.

For additional information on the divestiture of our Hillerød, Denmark manufacturing operations, please read Note 3, *Divestitures,* to these condensed consolidated financial statements.

# Exhibit D


1

## High cost of multiple sclerosis medicines is forcing many patients to take 'drastic actions'

*By* [Ed Silverman][2] [@Pharmalot][3]

January 13, 2020



*Rogelio V. Solis/AP*

---

The high cost of multiple sclerosis treatments has forced 40% of patients to take "drastic actions" and alter their use of the medicines, such as cutting back or skipping dosages altogether. And many report the financial burden is not only hurting their lifestyle, but impairing their ability to save for retirement or college for their children, a new survey found.

For instance, 14% reported they switched to a generic, despite being satisfied with their existing treatment; 12% stopped using their medication for a period of time; 9% skipped or delayed filling a prescription; and 8% took less of their medicine than prescribed, according to the [survey][4] by the National Multiple Sclerosis Society.

Meanwhile, the out-of-pocket costs associated with the medicines meant that 25% of the nearly 600 patients who responded to the survey spent less on themselves. In addition, 16% saved less for retirement or college, 11% spent less on groceries, 9% postponed paying other bills, 4% postponed retirement, and 2% took a second job.

"The survey findings continue to tell the real story of what it's like for people with MS to get the treatment that they need," said Bari Talente, executive vice president of advocacy for the National Multiple Sclerosis Society, which canvassed patients last summer. "It is these experiences and perspectives that should lead every conversation happening about drug pricing and access."

Trending Now: [5]

## Microglia: a new target in the brain for depression, Alzheimer's, and more? [6]

The results emerge amid a wider national debate over the cost of medicines in general. Drug pricing has become a key pocketbook issue for many Americans, prompting the Trump administration to devise several plans, none of which have gained traction, and Congress to propose numerous bills. But whether legislation will proceed remains unclear.

The cost of multiple sclerosis medicines, however, has been one of the flashpoints, as studies have demonstrated that patients and taxpayers face rising costs.

Last year, a study[7] in Neurology found that multiple sclerosis patients paid $15 a month average out-of-pocket costs in 2004, but that jumped to an average of $309 a month by 2016, a 20-fold increase over a 12-year period. Patients with high-deductible plans paid an average of $661 per month compared to $246 a month for those not in a high-deductible plan two years ago.

A recently study[8] in JAMA Neurology found that over a recent 10-year period, rising prices for multiple sclerosis drugs caused Medicare spending for the medicines to rise more than 10 times, and Part D beneficiaries saw out-of-pocket costs increase more than sevenfold. Spending per 1,000 beneficiaries by the health program jumped from nearly $7,800 in 2006 to more than $79,400 in 2016.

Meanwhile, the wholesale, or list, prices for a dozen drugs — new and old — continued to rise[9] between 2014 and 2019, according to academics at Oregon Health and Science University, whose earlier research[10] found prices for older medicines kept rising even as newer treatments were launched. The prices for the medicines ranged from approximately $76,000 to nearly $99,000.

For instance, Gilenya, a Novartis (NVS[11]) drug, rose from $63,444 to $99,896, while the cost of Avonex, which is sold by Biogen (BIIB[12]), increased from $59,085 to $$90,035. Tecfidera, another Biogen drug, climbed from $59,957 to $94,991. List prices do not reflect any rebates a

drug maker may pay for favorable placement on formularies, the list of medicines covered by health plans.

Price hikes have not gone unnoticed on Wall Street, either.

Earlier this month, PiperJaffray analyst Christopher Raymond expressed surprise that Biogen boosted prices as it did. As an example, he cited the Tysabri, which rose 3.5% and experienced price hikes in January 2019 and again in July 2019 by the same amount. Similarly, the list price for Tecfidera rose 6%, mirroring the price hike early last year.

"We think this is somewhat remarkable, given how much scrutiny has been assigned to pharmaceutical drug pricing — both in terms of tactics and industry structure — over the last several years," he wrote in an investor note. "But the broader point here is that … drug pricing mechanisms and economics that have attracted so much negative attention in recent years remain very much intact."

A spokesman for the BIO trade group wrote us that "patients should never have to go without the medicines they need because of what they are forced to pay out of their own pockets. As the results of this survey show, people face difficult choices when insurance companies discriminate against those who rely on prescription medicines and restrict patients' access to the therapies their doctors prescribe. This is exactly why we need a holistic solution, because it's the only way to ensure all patients have access to the medicines they need with out-of-pocket costs they can afford."

More than once, pricing has prompted the National Multiple Sclerosis Society to take companies to task.

Last fall, the organization criticized[15] Biogen for boasting that a newly approved pill would have the "lowest annual" wholesale price of any such medicine, although the difference amounted to $500 less than another new treatment from Novartis. The move was designed to appease criticism, but the organization accused the company of being disingenuous.

A Biogen spokeswoman wrote us to say the company "will continue to work closely with PBMs and payers to help minimize the impact of out-of-pocket costs to patients. Our approach is to consider modest price adjustments only for products we continue to substantially invest in (new research and increasing clinical evidence base) and limit adjustments for other products to minimum levels, in-line with inflation."

And over the past year, the patient group also chided Novartis for pricing its new Mayzent pill at $88,500 and EMD Serono for charging $99,500 for its new Mavenclad tablet. Such public statements are unusual from patient groups that accept industry funding. Drug makers provide

about 4% of total revenue to the organization, and Biogen is the largest donor, [contributing](16)
more than $1.3 million in 2018.

A [paper](17) in Neurology last November detailed how four unnamed executives acknowledged
that pricing for multiple sclerosis drugs is based on competition, insurance rebates, and the
ability to set U.S. prices higher than in other countries, rather than a long-standing industry
argument about the high cost of research and development.

"MS has seen remarkable treatment innovations in the last 25 years, but that progress doesn't
mean much if people with MS can't access these innovations due to price considerations, nor
should they experience the enormous challenges and choices we heard about in our survey,"
said Tim Coetzee, chief advocacy, services and research officer, at the National Multiple
Sclerosis Society.

## About the Author



[Ed Silverman](2)

Pharmalot Columnist, Senior Writer

Ed covers the pharmaceutical industry.

[ed.silverman@statnews.com](18)
[@Pharmalot](3)

## Tags

# Links

  1. https://www.statnews.com/category/the-regulars/pharmalot/
  2. https://www.statnews.com/staff/ed-silverman/
  3. https://twitter.com/Pharmalot
  4. http://freepdfhosting.com/9470cca738.pdf
  5. https://www.statnews.com/most-popular/
  6. https://www.statnews.com/2020/01/17/microglia-new-brain-target-depression-alzheimers-more/
  7. https://www.statnews.com/pharmalot/2019/05/02/multiple-sclerosis-out-of-pocket-drug-prices/
  8. https://www.statnews.com/pharmalot/2019/08/26/multiple-sclerosis-prices-medicare/
  9. http://freepdfhosting.com/1d3df6e9e4.pdf
 10. https://blogs.wsj.com/pharmalot/2015/04/24/multiple-sclerosis-drug-prices-rose-at-an-alarming-rate-study/
 11. https://www.google.com/search?tbm=fin&ei=4UwbXpeKGeHi9APT-
     qSoDw&stick=H4sIAAAAAAAAAONgecRoyi3w8sc9YSmdSWtOXmNU4-IKzsgvd80rySypFJLgYoOy-
     KR4uLj0c_UNknOSLKtyeABRqvrtOgAAAA&q=NYSE%3A+NVS&oq=nvs&gs_l=finance-

immersive.1.0.81l3.17597.18875.0.19973.15.8.0.0.0.0.99.577.7.7.0....0...1c.1.64.finance-immersive..11.3.244.0...0.99WFXsAmGAU

12. https://www.google.com/search?
tbm=fin&ei=23PNXdGANKuq5wKW45noBw&stick=H4sIAAAAAAAAAONgecRoyi3w8sc9YSmdSWtOXmNU4-
IKzsgvd80rySypFJLgYoOy-
KR4uLj0c_UNzKtyLXNyeABgzhR1OgAAAA&q=NASDAQ%3A+BIIB&oq=biib&gs_l=finance-
immersive.1.0.81l3.18796.20153.0.21355.13.9.0.0.0.0.108.543.4j2.6.0..2..0...1.1.64.finance-
immersive..9.4.353.0..81i8k1.0.qlzrTL4dhOA

13. https://www.statnews.com/signup/
14. https://www.statnews.com/privacy/
15. https://www.statnews.com/pharmalot/2019/11/14/biogen-multiple-sclerosis-drug-prices/
16. https://www.nationalmssociety.org/About-the-Society/Financials/Sources-of-Support/Pharmaceutical-Support
17. https://www.statnews.com/pharmalot/2019/11/25/multiple-sclerosis-drug-prices/
18. https://www.statnews.com/pharmalot/2020/01/13/multiple-sclerosis-drug-prices-
2/mailto:ed.silverman@statnews.com
19. https://www.statnews.com/tag/drug-pricing/
20. https://www.statnews.com/tag/neurology/

© 2020 STAT